**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

FIRST SECURITY BANK AND TRUST
COMPANY,

         Appellant,

vs.

HERMAN VANDER VEGT and
HENDRINA VANDER VEGT, and
BOERDERIJ DE VELDHOEK, LLC,

         Appellees.

No. C13-3063-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING APPEAL OF
BANKRUPTCY COURT ORDER**

_____

**TABLE OF CONTENTS**

**I.**   **INTRODUCTION AND BACKGROUND**............................................2
    **A.**   *Factual Background* ................................................................2
    **B.**   *Procedural Background* ..........................................................4

**II.**  **LEGAL ANALYSIS** .......................................................................8
    **A.**   *Appellate Jurisdiction*............................................................8
    **B.**   *Standard Of Review* ...............................................................12
    **C.**   *Issues On Appeal* ...................................................................13
    **D.**   *Analysis*..................................................................................13
        *1.*   *Section 364 financing* .................................................13
            *a.*   *Inability to obtain credit* ....................................15
            *b.*   *Adequate protection* ...........................................17
                *i.*   *Will the grants cover the costs of both
                    construction projects?*...................................20
                *ii.*   *Increase in the value of the Butler
                    County Farm* ..................................................22
                *iii.*   *Sufficient revenue to pay necessary
                    finance charges* ............................................25
                *iv.*   *Conclusion* ................................................26
        *2.*   *Motion to dismiss*.......................................................26

*III.    CONCLUSION* ............................................................................. **27**

This appeal from a decision of the bankruptcy court for the Northern District of Iowa raises the question of whether family dairy farmers should be permitted to incur $300,000 in additional debt for farm improvements, pursuant to 11 U.S.C. § 364(d), from a new creditor, with the loan being secured by "priming liens."[1] This and other questions are raised on the appeal by the family dairy farmers' primary creditor, a bank, from the order of the bankruptcy court conditionally granting the family dairy farmers' Motion to Incur Secured Debt and denying the bank's Motion to Dismiss the family dairy farmers' Chapter 12 bankruptcy case.

## I.    INTRODUCTION AND BACKGROUND

### A.    Factual Background

First Security Bank and Trust Company ("First Security") is a community bank with its primary office in Charles City, Iowa. In 2009 and 2010, First Security made a series of loans to Boerderij De Veldhoek, L.L.C. ("the L.L.C."), an Iowa L.L.C. These

---

[1] "A priming lien is a 'new lien on property that is given priority over existing liens.'" *In re WestPoint Stevens, Inc.*, 600 F.3d 231, 238 n.2 (2nd Cir. 2010) (quoting ALVIN L. ARNOLD, THE ARNOLD ENCYCLOPEDIA OF REAL ESTATE 438 (2d ed. 1993)); see *In re Olde Prairie Block Owner, LLC*, 515 Fed. App'x 590, 591 n.1 (7th Cir. 2013) ("A 'superpriority priming lien' places the right of a creditor to receive payment ahead of other creditors that would normally have superior claims to payments.").

loans were for the L.L.C. to purchase an 80 acre dairy farm, livestock, and dairy farm equipment in Butler County, Iowa ("Butler County Farm"). Herman and Hendrina Vander Vegt ("the Vander Vegts") owned and operated the L.L.C. (collectively, the Vander Vegts and the L.L.C. will be referred to as "the Debtors"). First Security owned the Butler County Farm, along with the livestock and dairy farm equipment, as a result of its foreclosure on the prior owner.

The Vander Vegts operated a dairy farm, Aver-Berkendijk Dairy Farms, Inc., in upstate New York until 2009, when they and their son, Jeremy Vander Vegt, moved to Iowa at the time of the Butler County Farm purchase. Aver-Berkendijk Dairy Farms, Inc., is a New York corporation ("the New York Farm"). The Vander Vegts also moved livestock and equipment from New York to Iowa. They continued to own real estate in New York and did not wind up the New York Farm.

First Security obtained a real estate mortgage on the Butler County Farm, and priority liens on certain personal property belonging to the Debtors. This personal property included all accounts and other rights to payment, inventory, equipment, instruments and chattel paper, general intangibles, documents, farm products and supplies, government payments, investment property, and deposit accounts. First Security perfected all of its security interests. First Security also received the Vander Vegts' unlimited personal guarantees as well as their agreement to maintain life insurance. First Security made additional loans to the Debtors in early 2010, and obtained a mortgage on the New York Farm.

During the next three years, First Security and the Debtors worked through a series of defaults and payment schedules while the Butler County Farm continually lost money. In the summer of 2012, First Security began foreclosure proceedings in the Iowa District Court for Butler County and was preparing to file foreclosure proceedings in New York.

### B.  *Procedural Background*

On August 31, 2012, the Vander Vegts and the L.L.C. each filed for bankruptcy, under Chapter 12 of the United States Bankruptcy Code, in the United States Bankruptcy Court for the Northern District of New York. The Debtors' bankruptcy filings automatically stayed, pursuant to 11 U.S.C. § 362, First Security's state court foreclosures for property located in Iowa and New York, pending resolution of the Debtors' Chapter 12 bankruptcies. First Security is the primary creditor, with claims against the Debtors' assets totaling over $2,684,040.75.

First Security obtained transfer of the cases from the Northern District of New York to the Northern District of Iowa. The two cases were transferred on October 25, 2012. The Vander Vegts' case was designated bankruptcy case no. 12-02144 and the L.L.C.'s case was designated bankruptcy case no. 12-02146. On December 7, 2012, First Security sought expedited relief from the automatic stay, or dismissal of the Debtors' Chapter 12 cases. On January 7, 2013, following a hearing and on the agreement of the parties, the bankruptcy court indefinitely continued First Security's motion.

On February 25, 2013, the Debtors filed a motion for authority to use cash collateral to purchase additional cattle and finance dairy operations. The bankruptcy court consolidated the Debtors' cash collateral motion with First Security's motion for relief from the automatic stay/motion to dismiss. On April 30, 2013, the bankruptcy court partially denied First Security's motion for relief from the automatic stay, and completely denied First Security's motion to dismiss. The bankruptcy court granted the Debtors' motion to use cash collateral. The bankruptcy court ordered the Debtors to pay First Security adequate protection payments once the Debtors reached designated revenue levels: at $47,500 per month in milk revenue, First Security is entitled to $2,500 per month; and at $50,000 per month in milk revenue, First Security is entitled to $5,000 per

month.  The bankruptcy court also granted First Security permission to commence foreclosure on the property located in New York.

With one exception, it is undisputed that First Security is the priority lienholder on all of the Debtors' real and personal property in both Iowa and New York.[2]  On June 7, 2013, the Debtors filed their Motion to Incur Secured Debt in which they sought permission to grant a new creditor "priming liens" to finance the Debtors' building of a new waste storage facility and a rotational pasturing facility for the Butler County Farm.  The Debtors asserted that these facilities would improve their dairy operation's efficiency and profitability.  In order to build these new facilities, the Debtors requested that the bankruptcy court permit them to incur $300,000 in additional secured debt, pursuant to either 11 U.S.C. § 364(c) or 11 U.S.C. § 364(d).  The Debtors proposed borrowing the money from First National Bank of Waverly ("First National").  The Debtors' proposal would permit First National to obtain a security interest senior to First Security on the Debtors' real and personal property.  Thus, all of First National's $300,000 loan would be senior to First Security's $2,684,040.75 claim.  First Security objected to the Debtors' proposal and filed a Motion to Dismiss.  In its Motion to Dismiss, First Security contended that the Debtors' Chapter 12 case should be dismissed for failing to file a proposed plan for reorganization of their operation within 90 days of their filing for bankruptcy, pursuant to 11 U.S.C. § 1208(c)(3).[3]

---

[2]The sole exception is that First Security is the subordinate lienholder on certain pieces of farming equipment in which certain equipment creditors hold purchase money security interests on the equipment.

[3]Herman Vander Vegt died after the Debtors' filed their Motion to Incur Secured Debt.

On October 13, 2013, the bankruptcy court conditionally granted the Debtors'
Motion to Incur Secured Debt, and denied First Security's Motion to Dismiss. *In re
Vander Vegt*, 499 B.R. 631, 639-640 (Bankr. N.D. Iowa 2013). The bankruptcy court
first concluded that 11 U.S.C. § 364(c) was inapplicable to the Debtors' motion to secure
debt due to First National's requirement that it be given priming liens on the Debtors'
property.[4] *Id*. at 636. The bankruptcy court next addressed whether the Debtors had
met the requirements to incur secured debt under 11 U.S.C. § 364(d). First, the
bankruptcy court found that the Debtors had met their burden, under § 364(d)(1)(A), of
demonstrating that less burdensome financing options were unavailable. *Id*. This
conclusion was based on Jeremy's testimony that he had unsuccessfully requested
financing from 15 to 20 other lenders. *Id*. Next, the bankruptcy court found that the
Debtors had met the requirement of providing First Security with adequate protection, as
required by § 364(d)(1)(B). *Id*. at 637. In reaching this conclusion, the bankruptcy court
found that the two projects would "more likely than not increase the value of the Debtors'

---

[4]Section 364(c) provides:

> (c) If the trustee is unable to obtain unsecured credit allowable
> under section 503(b)(1) of this title as an administrative
> expense, the court, after notice and a hearing, may authorize
> the obtaining of credit or the incurring of debt—
>
> > (1) with priority over any or all administrative
> > expenses of the kind specified in section 503(b) or
> > 507(b) of this title;
> >
> > (2) secured by a lien on property of the estate that is
> > not otherwise subject to a lien; or
> >
> > (3) secured by a junior lien on property of the estate
> > that is subject to a lien.

11 U.S.C. § 364.

property and [First Security's] collateral." *Id*. at 639.  This factual finding was, in turn based on several other factual determinations.  Specifically, the bankruptcy court found that the Debtors' project was only anticipated to take three months to complete and that, upon completion, two grants, totaling $300,000, from the United States Department of Agriculture, Natural Resources Conservation Service ("NRCS") would be distributed to the Debtors, enabling them to pay off the priming liens.  *Id*.  The bankruptcy court further found that the contractors on both projects would be required to carry performance bonds. As a result, the bonds not only protected First National's interests, but also provided "an additional layer of protection" for First Security because any payments to First National, from delays in the projects' completion, would be from a source other than First Security's collateral.  Finally, the bankruptcy court found that another layer of protection for First Security was provided by the bankruptcy court's conditioning its approval of the Debtors' Motion to Incur Secured Debt on the Debtors meeting all of the requirements for the NRCS grants prior to First National taking priming liens on First Security's collateral.  *Id*.  Thus, based on these unique factual circumstances, the bankruptcy court concluded that the Debtors had met the requirements to incur secured debt under § 364(d) and conditionally granted the Debtors' motion.

The bankruptcy court then turned to First Security's Motion to Dismiss.  The bankruptcy court concluded that the Debtors' should be granted additional time to file their plan in this case because there had been a number of excusable delays outside the Debtors' control in getting their plan on file.  *Id*. at 640.  Therefore, the bankruptcy court denied First Security's Motion to Dismiss.  In response to the bankruptcy court's order,

First Security timely filed its appeal of the bankruptcy court's rulings on the Debtors' Motion to Incur Secured Debt and First Security's Motion to Dismiss.[5]

## II.    LEGAL ANALYSIS

### A.    Appellate Jurisdiction

A district court has jurisdiction to hear appeals from a bankruptcy court pursuant to 28 U.S.C. § 158.[6] *See In re Gaines*, 932 F.2d 729, 731 (8th Cir. 1991).  A reviewing district court has jurisdiction to hear appeals from final orders, pursuant to 28 U.S.C. § 158(a)(1), and from interlocutory orders with leave of the court, pursuant to 28 U.S.C.

---

[5]Although there is no dispute that the bankruptcy court's order granting the Debtors' Motion to Incur Secured Debt is a final, appealable order, the parties dispute whether First Security's Motion to Dismiss is a final or an interlocutory order. Resolution of that issue is addressed below.

[6]Section 158(a) of Title 28 of the United States Code provides, in relevant part:

>    (a) The district courts of the United States shall have jurisdiction to hear appeals

>        (1) from final judgments, orders, and decrees;

>        (2) from interlocutory orders and decrees issued under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title; and

>        (3) with leave of the court, from other interlocutory orders and decrees;

>    and, with leave of the court, from interlocutory orders and decrees, of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157 of this title. . . .

28 U.S.C. § 158(a).

§ 158(a)(3). *See In re M & S Grading, Inc.*, 526 F.3d 363, 368 (8th Cir. 2008); *see also In re Hollway*, 370 Fed. App'x 490, 492 (5th Cir. 2010); *In re Comdisco, Inc.*, 538 F.3d 647, 650 (7th Cir. 2008); *In re Hooker Invs., Inc.*, 937 F.2d 833, 836 (2d Cir. 1991).

"To determine the finality of a bankruptcy court order, we consider (1) the extent to which 'the order leaves the bankruptcy court nothing to do but execute the order; (2) the extent to which delay in obtaining review would prevent the aggrieved party from obtaining effective relief; (3) the extent to which a later reversal on [the contested] issue would require recommencement of the entire proceeding.'" *Ritchie Special Credit Invs., Ltd. v. U.S. Trustee*, 620 F.3d 847, 852 (8th Cir. 2010); *see In re M & S Grading, Inc.*, 526 F.3d at 368; *In re Farmland Indus., Inc.*, 397 F.3d 647, 650 (8th Cir. 2005); *First Nat'l Bank v. Allen*, 118 F.3d 1289, 1293 (8th Cir. 1997); *In re Broken Bow Ranch, Inc.*, 33 F.3d 1005, 1007-08 (8th Cir. 1994); *In re Apex Oil Co.*, 884 F.2d 343, 347 (8th Cir. 1989). The Eighth Circuit Bankruptcy Appellate Panel has considered the same three factors in determining finality under 28 U.S.C. § 158(a)(1). *See In re Coleman Enters., Inc.*, 275 B.R. at 538.

There is no dispute that the bankruptcy court order granting the Debtors' Motion to Incur Secured Debt is a final, appealable order. Federal courts have repeatedly held that rulings on such motions are final orders for appeal purposes. *See In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 559 n.4 (3d Cir. 1994); *In re Foreside Mgmt. Co.*, 402 B.R. 446, 450 (B.A.P. 1st Cir. 2009); *In re Indian Motocycle Co., Inc.*, 289 B.R. 269, 283 (B.A.P. 1st Cir. 2003); *In re CMGT, Inc.*, 424 B.R. 355, 360 (N.D. Ill. 2010); *Suntrust Bank v. Den–Mark Constr., Inc.,* 406 B.R. 683, 687-88 (E.D.N.C. 2009); *Bank of New England v. BWL, Inc.*, 121 B.R. 413 (D. Me. 1990); *In re Gloria Mtg. Corp.*, 65 B.R. 341, (E.D. Va. 1985). The parties, however, dispute whether the bankruptcy court's decision denying First Security's Motion to Dismiss is a final order. Generally, orders denying a motion to dismiss have been deemed to be interlocutory. *See In re*

*Coleman Enters., Inc.*, 275 B.R. 533, 537 (B.A.P. 8th Cir. 2002); *see also In re Tr-Valley Distrib., Inc.*, 533 F.3d 1209, 1216 (10th Cir. 2008); *In re Rega Props., Ltd.*, 894 F.2d 1136, 1138 n.4 (9th Cir. 1990) (citing 1 COLLIER ON BANKRUPTCY ¶ 507[5], 5–29–30 (Lawrence P. King, ed., 15th ed. rev. 2001)); *In re Jartran, Inc.*, 886 F.2d 859 (7th Cir. 1989); *In re Waag*, 418 B.R. 373, 377 (B.A.P. 9th Cir. 2009); *Gebhardt v. Hardigan*, --- B.R. ---, 2014 WL 1320006, at *1 (S.D. Ga. Mar. 31, 2014).

Analyzing the three factors identified above for determining whether a bankruptcy court order is final, the first factor does not weigh in First Security's favor since the bankruptcy court has work remaining, namely, to determine whether any plan of reorganization can be confirmed and, if not, whether the case should then be converted to a Chapter 7 bankruptcy or dismissed. As to the second factor, any delay in reviewing the bankruptcy court order would not prevent First Security from obtaining effective relief. First Security's claims may well be paid through the normal course of the bankruptcy proceedings. If no confirmable plan is possible, the bankruptcy court may decide to dismiss the case. Meanwhile, all issues concerning the Debtors and their creditors are capable of resolution in the bankruptcy court, where all the Debtors' assets are under its control. Further, denial of First Security's Motion to Dismiss does not interfere with its ability to raise claims and defenses before the bankruptcy court. Thus, the second factor also does not weigh in First Security's favor. Finally, other courts have found that denial of a motion to dismiss is not a final order because such an order does not conclude the litigation. As the court recognized in *Coleman*: "'denial of a motion to dismiss, ordinarily, is the "antithesis" of a final order because, instead of terminating the case or any aspect of it, it allows the matter to proceed.'" *In re Coleman Enters., Inc.*, 275 B.R. at 538 (quoting *In re Giguere*, 188 B.R. 486, 488 (D.R.I. 1988)); *see In re National Office Prods., Inc.*, 116 B.R. 19, 21 (D.R.I. 1990) (describing the denial of motion to dismiss as representing the "antithesis" of a final order). Accordingly, I find

that the portion of the bankruptcy court's order denying First Security's Motion to Dismiss is an interlocutory order.

Where a bankruptcy order is not a final order, a district court may nevertheless grant leave for an interlocutory appeal. 28 U.S.C. § 158(a)(3). Although First Security did not seek leave to appeal the bankruptcy court's interlocutory order denying First Security's Motion to Dismiss, I may consider First Security's timely-filed notice of appeal as a motion for leave to appeal. FED. R. BANKR. P. 8003(c); *see In re M & S Grading, Inc.*, 526 F.3d at 371; *In re Faragalla*, 422 F.3d 1208, 1211 (10th Cir. 2005); *In re Wallace & Gale Co.*, 72 F.3d 21, 23 n.1 (4th Cir. 1995); *In re Coleman Enters., Inc.*, 275 B.R. at 537. A decision to deny leave to appeal an interlocutory order is purely discretionary. *See In re M & S Grading, Inc.*, 526 F.3d at 371; *In re Coleman Enters., Inc.*, 275 B.R. at 537. When deciding whether to grant leave to appeal an interlocutory order, courts have looked to the standards found in 28 U.S.C. § 1292(b), which govern the jurisdiction of courts of appeals to review interlocutory orders. *See In re Machinery, Inc.*, 275 B.R. 303, 306 (B.A.P. 8th Cir. 2002); *In re Coleman Enters., Inc.*, 275 B.R. at 538; *In re Moix–McNutt*, 215 B.R. at 409 n. 6 (B.A.P. 8th Cir. 1997). "Section 1292(b) requires that: (1) the question involved be one of law; (2) the question be controlling; (3) there exists a substantial ground for difference of opinion respecting the correctness of the [bankruptcy] court's decision; and (4) a finding that an immediate appeal would materially advance the ultimate termination of the litigation." *In re Machinery, Inc.*, 275 B.R. at 306 (citing 28 U.S.C. § 1292(b)); *see In re Lewis and Clark Apartments, LP*, 379 B.R. 47, 52 (B.A.P. 8th Cir. 2012); *In re Coleman Enters., Inc.*, 275 B.R. at 538-39; *In re Moix–McNutt*, 215 B.R. at 409 n. 6. Here, First Security seeks to raise the question of whether the bankruptcy court abused its discretion in granting the Debtors an extension of time to file their reorganization plan. This is a controlling question that is a question of law which holds the possibility of advancing the

ultimate termination of this litigation. Finally, the question raises the possibility for a difference of opinion concerning the correctness of the bankruptcy court's decision. Although I view this as an extremely close question, I will exercise my discretion to hear this interlocutory appeal. First Security's notice of appeal, which I construe as a motion for leave to appeal the Motion to Dismiss, is granted.

### B. Standard Of Review

"'When a bankruptcy court's judgment is appealed to the district court, the district court acts as an appellate court and reviews the bankruptcy court's legal determinations *de novo* and findings of fact for clear error.'" *In re Falcon Prods., Inc.*, 497 F.3d 838, 841 (8th Cir. 2007) (quoting *In re Fairfield Pagosa, Inc.*, 97 F.3d 247, 252 (8th Cir. 1996)); *see In re Armstrong*, 291 F.3d 517, 521-22 (8th Cir. 2002); *In re Cedar Shore Resort, Inc.*, 235 F.3d 375, 379 (8th Cir. 2000); *In re Clark*, 223 F.3d 859, 862 (8th Cir. 2000); *In re Dakota Rail, Inc.*, 946 F.2d 82, 84 (8th Cir. 1991); Fed. R. of Bankr. P. 8013. A district court reviews the bankruptcy court's interpretation of the bankruptcy code *de novo*. *See In re Zahn*, 526 F.3d 1140, 1142 (8th Cir. 2008); *In re Farmland Indus., Inc.*, 397 F.3d 647, 650 (8th Cir. 2005). Where issues are committed to the bankruptcy court's discretion, review is for abuse of discretion. *See In re Zahn*, 526 F.3d at 1142. "'The bankruptcy court abuses its discretion when it fails to apply the proper legal standard or bases its order on findings of fact that are clearly erroneous.'" *Id.* (quoting *In re Farmland Indus., Inc.*, 397 F.3d at 651). "Under the clearly erroneous standard, we will overturn a factual finding only if it is not supported by substantial evidence in the record, if it is based on an erroneous view of the law, or if we are left with the definite and firm conviction that an error was made." *Kingman v. Dillard's, Inc.*, 721 F.3d 613, 616 (8th Cir. 2013) (quoting *Roemmich v. Eagle Eye Dev., LLC*, 526 F.3d 343, 353 (8th Cir. 2008) (citation and internal quotation marks omitted)).

I will apply these standards to each of the issues now asserted in First Security's appeal of the bankruptcy court's order conditionally granting the Debtors' Motion to Incur Secured Debt and denying First Security's Motion to Dismiss.

## C. Issues On Appeal

First Security raises several issues in its appeal. Initially, First Security contends that the Debtors have failed to meet the requirements of 11 U.S.C. § 364(d). Specifically, First Security contends that the Debtors have not established that they have been unable to obtain credit by any other means, as required by § 364(d)(1)(A). First Security also contends that the Debtors have failed to show that First Security's position is adequately protected, as required by § 364(d)(1)(B). First Security also appeals the bankruptcy court's decision to deny First Security's Motion to Dismiss. First Security argues that the bankruptcy court erred in not dismissing the Debtors' Chapter 12 case for failure to file a reorganization plan within the 90 day period required under 11 U.S.C. § 1221.

## D. Analysis

### 1. Section 364 financing

The Debtors' Motion to Incur Secured Debt was based on 11 U.S.C. § 364(d). Section 364 authorizes various methods by which debtors may obtain financing.[7] Section

---

[7]As one bankruptcy court explained:

> A debtor, pursuant to 11 U.S.C. § 364(b), may incur unsecured debt as an administrative expense with first priority status under 11 U.S.C. § 507(a)(1). If the debtor cannot obtain credit as an administrative expense, it may acquire a loan that is either unsecured but senior to all administrative expense claims, secured by a lien on property that is not

364(d)(1), which permits a debtor to obtain financing secured by a lien senior to all other interests, provides that:

> The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
>> (A) the trustee is unable to obtain such credit otherwise; and
>>
>> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

"A debtor in possession has the rights, powers, and duties of a trustee pursuant to 11 U.S.C. § 1107(a)." *In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992); *see Suntrust Bank v. Den–Mark Constr., Inc.,* 406 B.R. 683, 689 n. 7 (E.D.N.C. 2009). Thus, the Debtors, as debtors in possession, may employ § 364(d) to obtain financing. *See In re 495 Cent. Park Ave. Corp.*, 136 B.R. at 630. In order to obtain financing, secured by a priming lien pursuant to § 364(d), the debtor must demonstrate that no suitable alternative financing is available from other sources, and that the proposed financing arrangement adequately protects the existing lienholders's interests. *See e.g., Suntrust Bank,* 406 B.R. at 689. The Debtors have the burden of proving that the requirements of § 364(d) have been met. *See In re 495 Cent. Park Ave.*

---

> secured, or secured by a junior lien on property already secured. 11 U.S.C. § 364(c). If the debtor cannot obtain financing by any of these means, the debtor may invoke 11 U.S.C. § 364(d) and obtain credit secured by a lien on property senior or equal to a prior lien.

*In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 630 (Bankr. S.D.N.Y. 1992).

*Corp.*, 136 B.R. at 630; *In re Reading Tube Indus.*, 72 B.R. 329, 331–32 (Bankr. E.D. Pa. 1987). The bankruptcy court found that the Debtors satisfied both prongs of § 364(d). First Security challenges both of these determinations.

### a.    Inability to obtain credit

The first prong of § 364(d) requires the debtor to prove that alternative financing is unavailable. 11 U.S.C. § 364(d)(1)(A); *see Suntrust Bank,* 406 B.R. at 689; *In re 495 Cent. Park Ave. Corp.*, 136 B.R. at 630. "Because super priority financing displaces liens on which creditors have relied in extending credit, the debtor must demonstrate to the court that it cannot obtain financing by other means." *In re 495 Cent. Park Ave. Corp.*, 136 B.R. at 626. However, a debtor is not required to seek credit from every possible lender before concluding that such credit is unavailable. *See In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir.1986); *see also Suntrust Bank,* 406 B.R. at 689; *In re Ames Dep't Store, Inc.*, 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990)). Rather, a debtor need only show that it has made reasonable efforts to seek other sources of credit. *See In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 n.44 (Bankr. S.D.N.Y. 2010); *Suntrust Bank,* 406 B.R. at 689; *In re Ames Dep't Store, Inc.*, 115 B.R. at 40. "A court must make its decision as to '[h]ow extensive the debtor's efforts to obtain credit must be' on a case-by-case basis." *Suntrust Bank,* 406 B.R. at 689 (quoting *In re Reading Tube Indus.*, 72 B.R. at 332); *see In re YL West 87th Holdings I LLC*, 423 B.R. at 441 n.44.

First Security contends the Debtors produced insufficient evidence which would support the bankruptcy court's finding that the Debtors were unable to obtain alternative financing. In support of its position, First Security points to the *Suntrust Bank* decision. In *Suntrust Bank*, the debtor was a real estate developer that was seeking court approval for a loan with a priming lien to develop a property. *Suntrust Bank*, 406 B.R. at 686–87. The bankruptcy court granted the debtor's financing motion; the district court

reversed and found, *inter alia*, the record did not "clearly indicate" that the debtor had unsuccessfully sought financing from other banks. *Id.* at 692. In reaching its decision, the district court noted that debtors had not identified any of "the unreceptive alternative sources they approached" and that its examination of the record left it with "the distinct impression" that the bankruptcy court's conclusion was "influenced in large part" by Suntrust Bank's decision not to extend further financing for other phases of the development project. *Id.* Here, I am left with no such impression. Instead, the bankruptcy court's decision was solely based on Jeremy's testimony that he had unsuccessfully requested financing from 15 to 20 other banks. Hearing Tr. at 56. Jeremy explained that: "[The Banks] feel the equity isn't in the facility because the facility is inefficient in all its pieces." Hearing Tr. at 56. These portions of Jeremy's testimony were uncontested.[8] Jeremy's testimony of rejection is also entirely consistent with the economic circumstances presented here. The Debtors own no unencumbered property and the loans they seek are for material improvements to the Butler County Farm, which is already fully encumbered by First Security. Under such circumstances, any potentially interested lender is likely going to require priming liens. Thus, the bankruptcy court's finding that the Debtors had met their burden of proving that they were unable to obtain alternative financing was not clearly erroneous. *See In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (finding that the debtor satisfied § 364(d)(1) where debtor approached four lenders); *Ames Dep't Store*, 115 B.R. at 40 (finding § 364(d)(1) requirement met where the debtors were unable to obtain comparable financing from "four leading lending institutions"). Therefore, I find no error in the bankruptcy court's determination that the Debtors' have satisfied § 364(d)(1)(a).

---

[8]So much so that the bankruptcy court believed that First Security did not dispute this issue. *In re Vander Vegt*, 499 B.R. at 636.

16

### b.     *Adequate protection*

The second prong of § 364(d) requires the debtor to prove that the interests of the holder of an existing lien on the property are adequately protected.    11 U.S.C. § 364(d)(1)(B); *see Suntrust Bank,* 406 B.R. at 689; *In re 495 Cent. Park Ave. Corp.*, 136 B.R. at 631.   "The whole purpose in providing adequate protection for a creditor is to insure that the creditor receives the value for which the creditor bargained prebankruptcy." *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987) (citing House Rep. No. 95–595, 95th Cong., 2d Sess. 53, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5963, 6295); *see In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (quoting *In re O'Connor*, 808 F.2d at 1396); *In re DB Capital Holdings, LLC*, 454 B.R. 804, 816–17 (Bankr. D. Colo. 2011) ("Adequate protection is, essentially, protection for the creditor to assure its collateral is not depreciating or diminishing in value and is evaluated on a case-by-case basis.") (citing *In re O'Connor*, 808 F.2d at1396–97).   What constitutes adequate protection is a factual question that "is to be decided flexibly on the proverbial 'case-by-case' basis." *In re O'Connor*, 808 F.2d at1396–97; *see In re Martin*, 761 F.2d 472, 474 (8th Cir. 1985) (holding that "adequate protection is a question of fact."); *see also In re Snowshoe Co.*, 789 F.2d at 1088 (concluding "that a judicial determination of such adequate protection is a question of fact rooted in measurements of value and the credibility of witnesses.").

The Bankruptcy Code does not define adequate protection, but § 361 states that adequate protection "may be provided by (1) periodic cash payments; (2) additional or replacement liens; or (3) other relief resulting in the 'indubitable equivalent' of the secured creditor's interest in such property." *In re Swedeland Dev. Grp., Inc.*, 16 F.3d at 564 (quoting 11 U.S.C. § 361).   The Debtors did not offer First Security either cash payments or an additional or replacement lien.   Thus, they must provide First Security

with "the indubitable equivalent of its interest in the property." 11 U.S.C. § 361. The Eighth Circuit Court of Appeals has explained:

> We find the inclusion of the phrase "indubitable equivalent" in section 361(3) most significant. The concept originated from an early bankruptcy case, *In re Murel Holding Corp.*, 75 F.2d 941 (2d Cir. 1935), in which Judge Learned Hand explained the meaning of "adequate protection" within the context of the Bankruptcy Act of 1889:
>
> > It is plain that "adequate protection" must be completely compensatory; and that payment ten years hence is not generally the equivalent of payment now. Interest is indeed the common measure of the difference, but a creditor who fears the safety of his principal will scarcely be content with that; he wishes to get his money or at least the property. We see no reason to suppose that the statute was intended to deprive him of that in the interest of junior holders, unless by a substitute of the most indubitable equivalence.
>
> *Id*. at 942.

*In re Martin*, 761 F.2d at 476. The court of appeals went on to direct that:

> In order to encourage reorganization, the courts must be flexible in applying the adequate protection standard. This flexibility, however, must not operate to the detriment of the secured creditor's interest. In any given case, the bankruptcy court must necessarily (1) establish the value of the secured creditor's interest, (2) identify the risks to the secured creditor's value resulting from the debtor's request for use of cash collateral, and (3) determine whether the debtor's adequate protection proposal protects value as nearly as possible against risks to that value consistent with the concept of indubitable equivalence.

*Id*. at 476-77.

The bankruptcy court, here, considered each of these factors in its analysis in arriving at its conclusion that the Debtors had satisfied the second prong of § 364(d). First, the bankruptcy court recognized it was "undisputed" that First Security was "undersecured and there is no equity in the property that could serve as adequate protection." *In re Vander Vegt*, 499 B.R. at 637. Second, the bankruptcy court identified the risks to First Security:

> If Debtors were unable to complete construction on the projects or make interest payments on the loan before grant disbursal, First National Bank could call the loan and have priority over FSBTC in a foreclosure. This would result in FSBTC receiving approximately $300,000 less than it would without the First National Bank priming lien. The Court, however, finds this risk to be small in this case.

*Id*.

The bankruptcy court held that First Security was adequately protected because the Debtors were providing First Security with "the indubitable equivalent" of its interest in the Debtors' property. This conclusion was based on several factual findings. First, the bankruptcy court found that the two projects which were the subject of the proposed loan would "more likely than not increase the value of the Debtors' property and [First Security's] collateral." *Id*. at 639. The bankruptcy court found that the Debtors' project was only anticipated to take three months to complete and that, upon completion, the two NRCS grants would be distributed to the Debtors, enabling them to pay off the priming liens. *Id*. The bankruptcy court further found that the contractors on both projects were required to carry performance bonds. As a result, the bonds not only protected First National's interests, but also provided "an additional layer of protection" for First Security because any payment to First National, from delays in the projects' completion, would be from a source other than First Security's collateral. *Id*. Finally, the bankruptcy court found that another layer of protection for First Security was provided by the

bankruptcy court's conditioning its approval of the Debtors' Motion to Incur Secured Debt on the Debtors meeting all of the requirements for the NRCS grants prior to First National taking priming liens on First Security's collateral. *Id*. Because the bankruptcy court's conclusion that First Security is adequately protected is a question of fact, *see In re Martin*, 761 F.2d at 472, unless this conclusion was "clearly erroneous," it must be affirmed. *See In re Snowshoe Co.*, 789 F.2d at 1088.

First Security contests the bankruptcy's conclusion that First Security is adequately protected. First Security argues that the bankruptcy court's conclusion was based on several factual inaccuracies.

### i. Will the grants cover the costs of both construction projects?

First Security challenges the bankruptcy court's finding that the "grants will cover the cost of both of Debtors' construction projects. . . ." *In re Vander Vegt*, 499 B.R. at 637. First Security argues the NRCS grants will not cover 100 percent of the costs of the two projects. First Security points to testimony of First National's vice president loan officer Scott Kaisand. First Security also bases its argument on a certain provision of the Code of Federal Regulations. I will take up each of these arguments in turn.

First Security points to Kaisand's testimony on cross-examination. There, Kaisand testified that he had been involved with two or three NCRS grants during his banking career. Hearing Tr. at 40. Based on these limited experiences, Kaisand testified as follows:

> Q. And is it your understanding that these are 100% loans?
>
> A. They are not. They are cost share.
>
> Q. Oh, so they involve some part of cash contribution by the borrower.
>
> A. Usually, yes.

20

> Q.   They're not 100 percent give me, are they?
>
> A.   No.
>
>      . . . .
>
> Q.   And sir, your understanding is that it's usually a 75 percent grant, isn't it?
>
> A.   I don't know that here, but usually yes.

Hearing Tr. at 40-41.

In contrast to Kaisand's testimony, Jeremy Vander Vegt testified that the NRCS grants would cover the full costs for constructing both projects. Hearing Tr. at 59. Kaisand similarly testified on direct examination that First National believed it would be paid in full from the grants. Hearing Tr. at 32. Moreover, on cross-examination, Kaisand went on to acknowledge that he never discussed cost sharing during his conversations with Jeremy over the projects. Hearing Tr. at 42. Thus, both First National and the Debtors view the grants as covering the projects' costs in their entirety. The grant documents contain no language which would suggest otherwise. The documents contain no provision requiring the Debtors to make co-payments or engage in a certain level of cost sharing on the projects. On this extremely limited record, I cannot conclude that the bankruptcy court's finding that the grants will cover the cost of both the projects was clearly erroneous.

First Security also contends that, as a matter of law, the NRCS grants cannot cover 100 percent of the projects' costs. First Security points to 7 C.F.R. § 1466.23(c)(1)(i)-(iii). Section 1466.23(c)(1)(i)-(iii) provides that:

> (c) Determining payment rates.
>
> (1) A payment to a producer for performing a practice may not exceed, as determined by the State or designated conservationist:

> (i) 75 percent of the estimated costs incurred by implementing the conservation practice;
>
> (ii) 100 percent of the estimated income foregone; or
>
> (iii) Both conditions in paragraphs (c)(1)(i) and (ii) of this section, where a producer incurs costs in implementing a conservation practice and foregoes income related to that practice implementation.

7 C.F.R. § 1466.23(c)(1)(i)-(iii).

Although this regulation ostensibly contains limitations on the amount that the United States Department of Agriculture will pay under its Environmental Quality Incentives Program ("EQIP"), on the record before me, I am unable to determine whether these limits are applicable to the two grants at issue. No testimony whatsoever was offered at the hearing concerning § 1466.23(c)(1)(i)-(iii). First Security did not call the NRCS officers or officials in charge of making the grants to the Debtors nor any expert witness knowledgeable about such grants. Finally, I note that the grant documents make no reference to § 1466.23(c)(1)(i)-(iii) nor do they contain any provision requiring the Debtors to make co-payments or engage in a certain level of cost sharing on the projects. The record does not establish any nexus between the grants at issue and § 1466.23(c)(1)(i)-(iii). Thus, on this record, I cannot conclude that § 1466.23(c)(1)(i)-(iii) establishes, as a matter of law, that the bankruptcy court's finding that the grants will cover the cost of both the projects was clearly erroneous.

### ii.     *Increase in the value of the Butler County Farm*

First Security also contends that the bankruptcy court lacked evidence that the proposed improvements will increase the value of the Butler County Farm by at least as much as the cost of construction. First Security argues that absent such evidence, the

bankruptcy court's reliance on *In re 495 Cent. Park Ave. Corp.* is misplaced and First Security will not be adequately protected.

In *In re 495 Cent. Park Ave. Corp.,* the debtor was seeking to obtain a priming loan of $625,000 to renovate a property. *In re 495 Cent. Park Ave. Corp.,* 136 B.R. at 629–30. The property was valued at between $2,200,000 and $2,250,000, subject to an existing mortgage held by a secured creditor, in the principal amount of $3,950,000. *Id.* at 628–30. Appraisers agreed that the proposed renovation to the property would most likely increase the value of the property, although the appraisers disagreed over the amount of increase value. *Id.* at 630. The bankruptcy court concluded that the renovation would likely increase the property's value by approximately $800,000. *Id.* The bankruptcy court found that:

> there is no question that the property would be improved by the proposed renovations and that an increase in value will result. In effect, a substitution occurs in that the money spent for improvements will be transferred into value. This value will serve as adequate protection for Hancock's secured claim.

*Id.* at 629.

First Security points out that, unlike *In re 495 Cent. Park Ave. Corp.*, the Debtors have offered no evidence regarding increased value of the Butler County Farm as a result of the two improvements. Although this is true, there is a significant difference between this case and *In re 495 Cent. Park Ave. Corp.* Here, the Debtors are eligible for $300,000 in grants which will pay off the loan in its entirety. Based on this fact and the fact that the project is only anticipated to take three months to complete, the bankruptcy court found that the two projects would "more likely than not increase the value of the Debtors' property and [First Security's] collateral." *Id.* at 639. This factual finding was not clearly erroneous. Jeremy testified that Butler County Farm's waste facilities were "inadequate" when the Vander Vegts purchased the farm and "it's still inadequate."

Hearing Tr. at 49.  He explained that the current waste facilities on the Butler County Farm are restricting the ability of the Debtors to expand their dairy operation since the waste facilities are already at their limits.  The current waste facilities also pose a health risk for the dairy cattle.  Hearing Tr. at 50.  The proposed waste facility, a liquefied manure storage system, will eliminate the health risks posed by the current waste facility and provide the Debtors with the opportunity to expand their dairy herd.  Obviously, the addition of a $250,000 modern liquefied manure storage system offering such benefits likely will increase the value of the Butler County Farm.  Particularly, under the circumstances of this case, where the costs of the new waste facility will be covered by a grant.

Similarly, the new rotational grazing system will offer improvements to the dairy farm which will likely translate into an increase in the value of the Butler County Farm. Jeremy testified that the Vander Vegts had successfully utilized such a system at the New York Farm.  Hearing Tr. at 59.  Jeremy also testified that such a system would reduce the Debtors' overhead expenses such as electricity, ventilation costs, and forage costs. Hearing Tr. at 59-60.  He explained that these costs are reduced because cows are allowed out of the confinement buildings on a regular basis and are free to forage on their own. Jeremey also explained that a rotational grazing system offered health benefits to the dairy cattle and reduced certain veterinary expenses.  Hearing Tr. at 60.  Jeremy pointed out that when the Vander Vegts utilized such a system in New York, their costs of production were over 50 percent lower than the industry average.  Hearing Tr. at 60.  Clearly, the addition of a new rotational grazing system, with its benefit of lowering dairy production costs, likely will increase the value of the Butler County Farm.  Again, such an increase

in value is particularly likely here where a grant will ultimately bear the costs of the new rotational grazing system.[9]

### iii.  Sufficient revenue to pay necessary finance charges

Finally, First Security challenges the bankruptcy court's finding that the Debtors have sufficient revenue to pay the necessary finance charges during the construction of the two projects.  First Security argues that the Debtors' lack the funds and discipline to make the interest payments to First National during construction of the projects.  The bankruptcy court, however, never made a specific finding regarding the Debtors' ability to service the loan from First National.  The bankruptcy court did find that: "The total interim financing costs payable by Debtors to First National Bank for the six-month term of the loan will total between $1,666.00 and $2,000.00 per month."  *In re Vander Vegt*, 499 B.R. at 634.  The bankruptcy court also noted that:

> Debtors point out their 2013 Cash Flow Projections already allocate $2,375.00 per month for post-petition credit for a Barn Renovation Loan and a USDA Emergency Loan–Cattle. Debtors have not requested those loan authorizations and the money could simply be redirected to pay the First National Bank loan.

*Id*. at 635.  From my review of the record, I conclude that the Debtors possess sufficient revenue to pay the necessary finance charges during the construction of the two projects. During the summer of 2013, the Debtors had net monthly average profits of $3993.96. First Security's Br. at 18.  While First Security points out that the Debtors lost $902.62

---

[9]First Security's argument that the new rotational grazing system may actually harm the value of the Butler County Farm due to its uniqueness is not supported by the record.  Although Jeremey testified that Herman first learned of this system while working at a research facility, presumably in the Netherlands, Jeremy also testified that this system has been used in Europe since the 1950's.  Hearing Tr. at 62.  There is no evidence in the record that such a rotational grazing system is a liability to the value of a dairy operation.

in September 2013, *see* First Security Br. at 18, even when that loss is included, the Debtors had net monthly average profits of $2769.82 over four months. This is more than sufficient to service the loan from First National.

### iv.    Conclusion

For the reasons discussed above, I conclude that the bankruptcy court's finding that the Debtors had met their burden of proving that they were unable to obtain alternative financing was not clearly erroneous. I also conclude that the bankruptcy's conclusion that First Security is adequately protected was not clearly erroneous. Therefore, the bankruptcy court did not err in concluding that the Debtors satisfied both prongs of § 364(d) and conditionally granting the Debtors' Motion to Incur Secured Debt.

### 2.    *Motion to dismiss*

First Security also appeals the bankruptcy court's decision to deny First Security's Motion to Dismiss. First Security contends that the bankruptcy court erred in not dismissing the Debtors' Chapter 12 case for failure to file a plan within the prescribed period. This contention lacks merit.

Section 1221 of Title 11 provides that "the debtor shall file a plan not later than 90 days after the order for relief under this chapter, except that the court may extend such period if the need for an extension is attributable to circumstances for which the debtor should not justly be held accountable." 11 U.S.C. § 1221. Accordingly, the bankruptcy court may grant an extension only if the debtor's inability to file a timely plan is due to circumstances beyond the debtor's control. Failure to file a timely plan under § 1221 is grounds for dismissal.[10]  *See* 11 U.S.C. § 1208(c)(3); *see In re Braxton*, 121 B.R. 632, 634 (Bankr. N.D. Fla. 1990).

---

[10]Section 1208(c)(3) provides:

Here, the bankruptcy court found that "Debtors should have additional time to file their plan in this case. There have been a number of delays in getting the plan on file including delays resulting from consideration of creditor's resistance and the Court issuing decisions." *In re Vander Vegt*, 499 B.R. at 640. Thus, the bankruptcy court implicitly found that the Debtors' inability to timely file the plan was due to circumstances for which the Debtors should not justly be held accountable, namely, the bankruptcy court's consideration of creditor's resistances to the Debtors' motions and the bankruptcy court's issuance of orders. Although the bankruptcy court did not quote or paraphrase § 1221's language, that the extension need be due to circumstances for which the debtors should not justly be held accountable, no talismanic incantation of the precise language in § 1221 is required. The bankruptcy court clearly understood the standard required for an extension under § 1221 and did not abuse its discretion in granting such an extension in this case. Accordingly, no basis exists in the record for dismissing the Debtor's Chapter 12 case under § 1208(c)(3), and the bankruptcy court did not err in denying First Security's Motion to Dismiss.

### III.   CONCLUSION

For the reasons discussed above, I reject each of First Security's allegations of error by the bankruptcy court in its determinations that the Debtors had satisfied the

---

> (c) On request of a party in interest, and after notice and a hearing, the court may dismiss a case under this chapter for cause, including--
>
> . . . .
>
> (3) failure to file a plan timely under section 1221 of this title;

11 U.S.C. § 1208(c)(3).

requirements of 11 U.S.C. § 364(d) to permit them to incur secured debit and that the debtors had met the required standard, under 11 U.S.C. § 1221, for an extension to file their proposed reorganization plan. Therefore, the bankruptcy court's order conditionally granting the Debtors' Motion to Incur Secured Debt and denying First Security's Motion to Dismiss is affirmed in its entirety.

**IT IS SO ORDERED**.

**DATED** this 27th day of May, 2014.

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA